**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF UTAH NORTHERN DIVISION**

| | |
|---|---|
| OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY, a Minnesota corporation,<br><br>      Plaintiff,<br><br>vs.<br><br>THE HOME ABSTRACT AND TITLE COMPANY, INC., a Utah corporation; RUSSELL CHARLES MAUGHAN, an individual; BRANDALYN BANGLE, an individual,<br><br>      Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING, IN PART, PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANTS**<br><br>Case No.  1:12cv00171<br><br>Judge David Nuffer<br>Magistrate Judge Evelyn J. Furse |

## TABLE OF CONTENTS

CASE OVERVIEW ..................................................................................................................1

MOTION FOR SUMMARY JUDGMENT.................................................................................1

UNDISPUTED FACTS. ...........................................................................................................2

I.      BREACH OF AGENCY AGREEMENT (FIRST CAUSE OF ACTION) .....................32

II.     BREACH OF FIDUCIARY DUTY (SECOND CAUSE OF ACTION). .........................33

III.    NEGLIGENCE (FIFTH CAUSE OF ACTION) ...............................................................34

IV.   PIERCING THE CORPORATE VEIL (TENTH CAUSE OF ACTION). ......................35

V.    INDEMNIFICATION (NINTH CAUSE OF ACTION) ...................................................37

ORDER ...................................................................................................................................38

## CASE OVERVIEW

This case arises from an embezzlement of over $300,000 in proceeds from a real estate transaction between Huntsville City and Weber School District. Defendant The Home Abstract and Title Company, Inc. ("Home Abstract") acted as the escrow agent for the transaction. Defendant Russell Charles Maughan ("Maughan") was the President of Home Abstract and his daughter, Defendant Brandalynn Bangle ("Bangle"), was the Secretary. As the underwriter of the title insurance policy issued by Home Abstract in connection with the transaction, Plaintiff Old Republic National Title Insurance Company ("Old Republic") was obligated to pay $306,923 to Weber School District pursuant to Utah Code § 31A-23a-407. Consequently, Old Republic filed this action against Home Abstract, Maughan, and Bangle.[1]

This order grants summary judgment on the First, Second, Fifth, Ninth, and Tenth Causes of Action as against Home Abstract and Maughan only. This order grants summary judgment on the Second and Fifth Causes of Action as against Bangle. This order denies summary judgment on the First, Ninth, and Tenth Causes of Action as against Bangle.

## MOTION FOR SUMMARY JUDGMENT

### Issues and Claims in this Case and Motions

Old Republic filed this action seeking reimbursement for the $306,923 it was required to pay Weber School District as a result of Maughan's embezzlement of the proceeds of Weber School District's sale of certain real property to Huntsville City. Old Republic alleges that Bangle, who was a licensed escrow officer, assisted Maughan in transferring the proceeds from Home Abstract's trust account to its operating account and then used the proceeds to pay the

---

[1] [Docket No. 1].

1

operating expenses of Home Abstract, to make payments on behalf of other business entities owned by Maughan and Bangle, and to pay the personal expenses of Maughan and Bangle and their family members, including mortgage payments, credit card payments, and car payments. Bangle admits that she transferred all the disputed funds from the trust account to the operating account but claims she only did so at the request and direction at Maughan. Maughan pled guilty to felony theft for the embezzlement and is currently incarcerated in the Utah State Prison.

Old Republic moved for summary judgment on its First Cause of Action (Breach of Contract), Second Cause of Action (Breach of Fiduciary Duty), Fifth Cause of Action (Negligence), Ninth Cause of Action (Indemnification), and Tenth Cause of Action (Piercing the Corporate Veil).[2] Neither Home Abstract nor Maughan opposed the motion for summary judgment.[3]

### Undisputed Facts

The following factual statements from Old Republic's motion for summary judgment and Bangle's memorandum in opposition are not disputed.

1.      Home Abstract was a family owned business.  During the relevant time period – 2009 through 2012 – Maughan was the President of Home Abstract.  Bangle was the Secretary.[4]

2.      As Maughan explained in his deposition, the officers and directors of Home Abstract – more specifically Maughan and Bangle – treated their personal funds, funds from other entities owned or controlled by them, funds of Home Abstract, and escrow funds of third

---

[2] [Docket No. 38].

[3] On September 17, 2013, counsel for Home Abstract moved to withdraw.  [Docket No. 31].  On September 19, 2013, the Court entered an Order granting the motion to withdraw and directing Home Abstract to file a notice of appearance of counsel within 21 days of the date of the Order.  [Docket No. 32].  Home Abstract failed to do so.

[4] Deposition of Brandalyn Bangle ("Bangle Depo.") at 13:5-9. [Docket No. 39-2].

parties deposited with Home Abstract as one big "bucket of ice cream." This commingled "bucket of ice cream" was then used to fill whatever "dishes" needed ice cream in them. These dishes included loan obligations of the other entities and personal obligations of Maughan and Bangle and other family members, including mortgage payments, car payments, and credit card payments.[5] Maughan was speaking for himself, and not Bangle. Additionally, he clearly stated that the same approach was not taken with "personal family members" and obligations. Further, the loans and flow of money were all documented and accounted for.[6]

3.　　Home Abstract did not have annual meetings.  No minutes were kept.  There was no operating agreement.[7]

4.　　Maughan and Bangle are father and daughter.  They are very close.[8]

5.　　During the relevant time period, Maughan and Bangle were licensed escrow officers.[9]

6.　　As licensed escrow officers, they knew that funds could never be transferred from the trust account to the operating account.[10]

7.　　During the relevant time period, Maughan's wife (Gina Maughan) and son (Jacob Maughan) were not involved in Home Abstract. Jacob's only involvement in Home Abstract was

---

[5] Deposition of Russell C. Maughan ("Maughan Depo.") 42:2-43:3. [Docket No. 39-1].

[6] Maughan Depo. 42:20-43:17.

[7] Bangle Depo. 37:6-13.

[8] Bangle Depo. 11:13-15; 18:3-5.

[9] Bangle Depo. 9:14-18.

[10] Bangle Depo. 29:22-30:1; 168:18-20; Maughan Depo. 22:12-21.

as a delivery person for approximately six months before 2008. Gina "retired basically" in 2009.[11]

8.     Maughan and Bangle had interests in several other entities involved in the defalcation, including the Maughan Family Partnership ("Family Partnership"), R&G Maughan Family, LLC ("Family LLC"), Wolf Creek Associates ("Wolf Creek"), DRMW Development, Inc. ("DRMW"), Glacier Rock Investments, LLC ("Glacier Rock"), First Cabin Investments, LLC ("First Cabin"), Decorative Rock Products, LLC ("Decorative Rock"), and Maughan-Browning Land Company, Inc. ("Land Company").[12] Bangle testified during her deposition that while she had heard of the entities listed by Old Republic, she did not know that she had been listed as a member of any of the entities.[13]

9.     Home Abstract's offices were used by several of these entities, including DRMW, Family Partnership, Land Company, Land Exchange, and Glacier Rock.[14] Bangle admits to seeing bank statements for the listed entities at Home Abstract's offices.[15]

10.    Maughan and his wife, Gina, had a family trust – the R&G Maughan Family Trust, LLC ("Trust") – to which they conveyed their personal residence.  Bangle is a beneficiary

---

[11] Bangle Depo. 12:14-24; 15:5-10.

[12] Bangle Depo. 42: 25-52:12; Maughan Depo. 27:17-22; 136:25-140:6.

[13] Bangle Depo. 42:25 – 52:12; *see also* Affidavit of Brandalyn Bangle ("Bangle Aff.") ¶ 30. [Docket No. 44 at 4-13].

[14] Maughan Depo. 236:4-21.

[15] Bangle Depo. 50:16-23; 52:2-9.

of the Trust.[16] Bangle did not know that she was a beneficiary of her parents' Trust, but her mother, Gina Maughan, has told her this is true.[17]

11.    There were several bank accounts used in connection with the defalcation:  Home Abstract's trust account with KeyBank ("Trust Account"); Home Abstract's operating account with Bank of Utah ("Operating Account); the Family Partnership's checking account with Bank of Utah ("Family Partnership Account"); the Family LLC's checking account with Bank of Utah ("Family LLC Account"); and Home Abstract's trust account for the benefit of Marie A. Martinez ("Martinez Trust Account").

12.    Maughan had signature authority on all of these bank accounts.  Bangle had signature authority on the Trust Account, Operating Account, and Martinez Trust Account.[18]

13.    There was no limit on Maughan's or Bangle's individual signing authority on the Operating Account, the Trust Account, or the Martinez Account.  They also had authority to initiate wire transfers.  Although there was a requirement that wire transfers be authorized by one signer and then verified by another signer, this requirement was regularly ignored.[19] Bangle never wrote any checks or initiated any wire transfers that were not at the direction of her father, or with his review and approval.[20]

---

[16] Maughan Depo. 24:19-23.

[17] Bangle Aff. ¶ 31.

[18] Maughan Depo. 20:21-22-2.

[19] Bangle Depo. 32:9-12; 33:2-15.

[20] Bangle Aff. ¶¶ 7-9.

14.      Other than a Chevron credit card, Home Abstract did not have any company credit cards. It did not have any lines of credit.[21]

15.      Bangle was responsible for paying the bills of Home Abstract from the Operating Account. She signed almost all of the checks from the Operating Account. She was responsible for reconciling the Operating Account each month.[22] Bangle's duties included reconciling the Operating Account and paying bills, but claims each and every check was reviewed by Maughan and items were paid at his direction.[23]

16.      Other than Home Abstract, Maughan had no other source of income during the relevant time period. His wife, Gina, was retired.[24]

17.      Maughan had a Chase mortgage and Bank of Utah home equity line of credit on his personal residence.[25]

18.      He also owned the following personal vehicles, which were paid for by Home Abstract: two Audi sedans, an Audi TT, and a Tahoe.[26]

19.      Maughan had several personal credit cards, including credit cards with American Express, America First, Goldenwest Credit Union, Bank of Utah, Chase, and Wells Fargo.[27]

20.      Maughan had a country club membership with Ogden Golf and Country Club.[28]

---

[21] Bangle Depo. 54:9-18; Maughan Depo. 31:22-25.

[22] Bangle Depo. 9:19-10:2l 34:16-20; 88:17-22; Maughan Depo. 21:22-2.

[23] Bangle Aff. ¶¶ 8-9.

[24] Bangle Depo. 80:24-81:2.

[25] Maughan Depo. 24:8-20; 25:3-11.

[26] Maughan Depo. 32:24-33:3.

[27] Maughan Depo. 31:2-4; 178:23-25; 196:11-17; 198:22-25; 208:4-9.

[28] Maughan Depo. 191:4-8.

21.     Despite the fact that Gina was retired and Maughan was not receiving a paycheck from Home Abstract, they still paid the living expenses of their son, Jacob.[29]

22.     Whenever Maughan needed money, he would simply tell Bangle to issue him a check from the Operating Account and she would do so.[30] Bangle testified in her deposition when she would ask Maughan what the money was for, he always told her it was a loan and she would code the transaction in QuickBooks that way. Bangle never moved money from the escrow account to the operating account without Maughan's instruction.[31]

23.     According to Bangle, her compensation from Home Abstract was $35,000 per year. In addition, Home Abstract paid for her gas.[32] In addition to her salary, Bangle was reimbursed for her vehicle, cell phone, health insurance, and fuel for business.[33]

24.     Bangle had a mortgage on her personal residence with Wells Fargo.  She had personal credit cards with America First Credit Union and Target.[34]

25.     Bangle also owned cars and a boat, which were financed with America First Credit Union[35] but this boat was sold in 2010.[36]

26.     Starting in 2009, the Operating Account had a deficit every month. Although the deficit "varied," it was never more than $5,000.[37]

---

[29] Bangle Depo. 19:1-2.

[30] Maughan Depo. 52:2-8.

[31] Bangle Depo. 41:24-42:11; 75:25-76:3; 114:4-17; 147:5-16; Bangle Aff. ¶¶ 19-21; Maughan Depo. 21:13-15.

[32] Bangle Depo. 13:15-16:5.

[33] Bangle Depo. 76:17; Bangle Aff. ¶¶ 33-35.

[34] Bangle Depo. 76:20-78:7.

[35] *Id.*

[36] Bangle Aff. ¶ 26.

[37]

27.     In 2009 and 2010, Maughan and Bangle transferred money from the Martinez Trust Account, which was an escrow account established for Marie A. Martinez by her ex-husband to distribute a monthly payment of $1,200 to her for her lifetime.  Home Abstract was the Trustee of the Martinez Trust Account.[38] Bangle did transfer funds from various accounts to other accounts, always at the request and direction of Maughan.[39]

28.     Bangle knew that the funds were being transferred from the Martinez Trust Account to the Operating Account to "cover the bills" that she was in charge of paying.[40] Maughan told Bangle that he would cover the transfers because he had other notes he was collecting on.[41]

29.     In 2009 and 2010, Maughan, with the assistance of Bangle, transferred approximately $405,000 from the Martinez Trust Account to the Operating Account.  These transfers occurred in September 2009 ($50,000), October 2009 ($150,000), November 2009 ($60,000), December 2009 ($55,000), January 2010 ($50,000) and March 2010 ($40,000).[42] Maughan told Bangle that he would cover the transfers because he had other notes he was collecting on.[43]

30.     As the Trustee, Home Abstract was required to pay Mrs. Martinez $1,200 per month from the Martinez Trust Account. Because all of the escrow funds had been diverted from

---

[37] Bangle Depo.35:4-22; Maughan Depo. 68:2-10.

[38] Maughan Depo. 18:18-19:18; 20:8-20; 21:5-15; 68:15-18.

[39] Bangle Aff. ¶¶ 7, 17; Maughan Depo. 21:2-9.

[40] Maughan Depo. 21:5-22:2.

[41] Bangle Aff. ¶ 21; Maughan Depo. 21:24-22:4.

[42] Exhibit 11 to Old Republic's Motion. [Dkt # 41-6].

[43] Bangle Aff. ¶¶ 18-21; Maughan Depo. 21:24-22:4.

the Martinez Trust Account, Bangle would transfer $1,200 each month from the Operating Account to the Martinez Trust Account so that she could issue the $1,200 monthly payment from the Martinez Account.[44] Bangle denies knowing that Maughan had taken money from the Martinez Trust.[45]

31.     For example, Bangle wire transferred $1,200 from the Operating Account to the Martinez Trust Account on October 31, 2011, November 29, 2011, December 20, 2011, and January 24, 2012[46] per instruction from Maughan but he did not tell her what the purpose of the transfer was. Bangle only acted upon instruction from Maughan.[47]

32.     During the relevant period of time, Bangle would notice that "money would go missing" from the Operating Account. When she asked Maughan about the missing money, he told her that they were "loan payments back" to Maughan. Although she had never seen any documentation of these alleged loans, she did not question Maughan further.[48] When she would ask what the money was for, he always told her it was a loan and she could code the transaction in QuickBooks that way. It was common for money to be loaned by and repaid to the Maughan Family Partnership and Bangle had no reason to believe something illegal was taking place.[49]

33.     In October 2011, Bangle issued a $15,000 check from the Trust Account to the Operating Account.   She could not explain what the check was for.[50] When employees

---

[44] Exhibits 5, 6 and 9 to Old Republic's Motion. [Docket No. 39-5, 41-1, 41-4].

[45] Bangle Aff. ¶¶ 17, 19-21.

[46] Maughan Depo. 177:3-9; *see also* Exhibit 9 to Old Republic's Motion. [Docket No. 41-4].

[47] Bangle Aff. ¶¶ 7, 17, 19-21; Maughan Depo. 21:13-15.

[48] Bangle Depo. 40:21-41:23; 75:25-76:3.

[49] Bangle Aff. ¶¶18-21; Bangle Depo. 41:24-42:11; 75:25-76:3; 114:4-17; 145:17-19; 147:5-16.

[50] Bangle Depo. 177:6-13.

completed closings, it was common for the employees to bring Bangle a stack of checks from the Trust Account to sign if another signatory wasn't available. Based on this routine, she was of the understanding that this check was for a closing.[51]

34.    Home Abstract paid for Bangle's personal car, which she used to drive to and from work.[52] Bangle testified that she never used her car for personal business.[53]

35.    Home Abstract paid $750 per month to America First Credit Union.  According to Bangle, this payment was for "a car payment"[54] not only for her vehicle, but for other company cars as well.[55]

36.    In 2012, Home Abstract paid off Bangle's car, which she kept after Home Abstract closed its doors in May 2012.[56] She asked her father and her uncles if they wanted to take the 2006 Chevy Equinox she had possession of and sell it, but they declined and told her to keep the car.[57]

37.    Home Abstract also paid Bangle $600 per month in addition to her salary.  Bangle claims that the monthly payment, which never varied, was for "reimbursed expenses." Defendants failed to produce any documentation of such alleged "expenses."[58]  Bangle testified several times during her deposition that she made purchases or paid bills for Home Abstract with her personal funds.  She did this on a monthly basis, and was reimbursed for these expenses.

---

[51] Bangle Aff. ¶ 16.

[52] Bangle Depo. 118:18-119:9.

[53] Bangle Aff. ¶ 35; Bangle Depo. 118:18-119:16.

[54] Bangle Depo. 118:18-119:9.

[55] Bangle Aff. ¶ 35.

[56] Maughan Depo. 29:9-10.

[57] Bangle Aff. ¶¶ 35-26; Bangle Depo. 39:9-13.

[58] Bangle Depo. 120:10-12.

Examples of items she purchased were: office supplies, water, snack foods, dish soap, paper, phone bills, Chevron payments, computer equipment, car payments and the copier lease.[59]

38.     Moreover, contrary to Bangle's testimony, Maughan claimed that the monthly payment was for Bangle's "health insurance."[60]

39.     Bangle also took "payroll advances" from Home Abstract. For example, on June 14, 2011, she issued a check in the amount of $3,500 to herself. There is no documentation of the payroll advance and no evidence that this payroll advance was ever repaid.[61] Bangle testified that this payroll advance was documented in QuickBooks and by Maughan's accounting, and that she paid the advance back by obtaining a personal credit card loan. Bangle also testified that she does not have any of the documentation or files, and she was told that Old Republic took all of these files in May 2012.[62]

40.     Bangle regularly issued large checks to herself which she was unable to explain. When questioned about the payments in her deposition, she would only state that they were "reimbursements" or "payments" but provided no specifics. The total amount of these checks in 2011 exceeded $20,000.[63]

41.     For example, in January 2012, Bangle issued a $3,000 check to Wells Fargo (her mortgage company) and a $1,752.31 check to John Bangle (her husband).[64] Bangle admits that her personal mortgage is with Wells Fargo, but denies that she ever paid her mortgage with funds

---

[59] Bangle Aff. ¶¶ 22-25; Bangle Depo. 120:20-22; 128:25-129:6; 132:19-21; 141:10-19; 157:1-6.

[60] Maughan Depo. 168:24-169:3.

[61] Bangle Depo. 130:12-24.

[62] Bangle Depo. 21:20-22:13; 130:12-131:4; 135:6-13.

[63] Bangle Depo. 130:12-166:11.

[64] Bangle Depo. 156:2-6.

from Home Abstract. Further, Maughan testified that he was never aware of Bangle paying her personal mortgage with Home Abstract funds. Also, he has a debt with Wells Fargo, which could explain the payment to Wells Fargo. Bangle also testified that the money paid to John Bangle would have been to pay for services he rendered to the company, such as fixing items around the office or purchasing parts for cars.[65]

42.     Maughan could not explain why there were so many checks issued to Bangle during this period of time. With respect to some transactions, he "guessed" that they were payments for expenses or for bills that Bangle paid on behalf of Maughan. With respect to other large transactions, he admitted that he just didn't know.[66] Maughan testified during his deposition that he regularly had Bangle pay his personal bills with her own funds, and then he would pay her back with a check from Home Abstract. Additionally, she purchased numerous items for the office:  supplies, bills, etc.  Maughan personally reviewed the checks that Bangle wrote and approved them.[67]

43.     Bangle also regularly paid her Target credit card from the Operating Account.[68] Bangle made purchases for Home Abstract with her personal Target card on a monthly basis, and was reimbursed for these expenses.[69]

44.     Maughan often had Bangle issue checks from the Operating Account to pay his mortgage, his HELOC, the car payment on his wife's car, his credit card payments (Wells Fargo, Bank of Utah, America First, American Express and Chase), and his life insurance payment

---

[65] Bangle Aff. ¶¶ 25, 39; Bangle Depo. 151:5-11; 156:7-10; Maughan Depo. 178:20-179:7.

[66] Maughan Depo. 173:9-12.

[67] Bangle Aff. ¶¶ 7, 9, 22-25; Maughan Depo. 181:6-22; 190:21-191:2; 191:18-21.

[68] *Id.*

[69] Bangle Depo. 128:25-129:6; 141:10-19; 152:11-14; Maughan Depo. 179:8-25; 190:21-191:2.

(Northwestern)[70] upon instruction from Maughan. Additionally, when she would ask what the money was for, Maughan always told her it was a loan and she would code the transaction in QuickBooks that way.[71]

45.     Home Abstract paid Maughan's Ogden Golf and Country Club membership expenses and made charitable donations on behalf of Maughan and his wife.[72] Bangle has no knowledge concerning the accuracy of these allegations. Bangle does admit that her father asked her to pay many of his personal expenses, for which Russell told he that he would account for the reimbursements through his personal loans with the company.[73]

46.     Home Abstract paid Glacier Rock's loan obligations.[74]

47.     Home Abstract paid Wolf Creek's legal fees.[75]

48.     Home Abstract transferred $55,000 to First Cabin, an entity owned by Maughan.[76]

49.     In November 2011, Home Abstract paid off the car loan on Gina's Audi TT.[77]

50.     Also in November 2011, there was an $8,000 transfer to Wolf Creek. Again, Bangle never questioned why an $8,000 payment was being made to one of Maughan's entities

---

[70] Maughan Depo. 173:20-240:25.

[71] Bangle Aff. ¶¶ 18-21; Bangle Depo. 41:24-42:11; 75:25-76:3; 114:4-17; 145:17-19; 147:5-16; Maughan Depo. 21:13-15.

[72] Maughan Depo. 135:23-136:14.

[73] Bangle Aff. ¶¶ 22-23.

[74] Maughan Depo. 76:18-78:10.

[75] Maughan Depo. 137:10-14.

[76] Maughan Depo. 240:19-25.

[77] Bangle Depo. 147:20-148:6.

out of the Operating Account.[78] Bangle was not privy to the inner workings of Maughan's business entities. When Maughan, her boss and president of Home Abstract, directed her to take an action she did as he asked.[79]

51.     Home Abstract paid for Maughan's legal fees related to personal legal matters. Home Abstract paid for "all of [Maughan's] social dinners and things."[80]

52.     There were several large wire transfers to a friend of Maughan's – Richard Saunders – during 2011. On May 24, 2011, Home Abstract paid $10,000 to Mr. Sanders.  On September 20, 2011, Home Abstract paid him $8,000.  Bangle testified that she did not know what the payments were for.[81] Mr. Saunders was a client of Home Abstract and he bought and sold land. Bangle understood that Mr. Saunders was a client. Maughan testified the transaction was for a "one-day loan" and that it had been paid back to Home Abstract.[82]

53.     In November 2011, Home Abstract paid off Maughan's Tahoe.[83]

54.     In January 2012, Maughan had Bangle issue a $13,000 check to Bonneville Collections to satisfy a personal judgment against him[84] but it was her understanding that this was to pay off a collection account for Home Abstract.[85]

---

[78] Bangle Depo. 148:20-25; Maughan Depo. 199:15-21.

[79] Bangle Aff. ¶¶ 22-25, 29-30; Bangle Depo. 42:25 – 52:12; 41:24-42:11; 75:25-76:3; 114:4-17; 147:5-16.

[80] Maughan Depo. 176:17-19; 189:22-190:8.

[81] Bangle Depo. 127:8-20; Maughan Depo. 171:25-172:17; 185:25-186:7.

[82] Bangle Depo. 127:8-20; Maughan Depo. 171:25-172:17.

[83] Maughan Depo. 197:24-198:4.

[84] Maughan Depo.207:6-17.

[85] Bangle Depo. 117:18-25; 155:22-156:1.

55.     Although Maughan claimed these payments made on his behalf were repayments of loans, Bangle never saw any documents regarding these alleged "loans" from Maughan to Home Abstract.[86]

56.     Home Abstract also paid for cars for Maughan, Bangle, Jacob (Maughan's son), and Gina (Maughan's wife).[87]

57.     Although Maughan's son Jacob was only a delivery person for six months prior to 2008, Home Abstract continued to provide him a car and pay for his gas and cell phone until May 2012.[88]

58.     Home Abstract also paid for cars for its other non-family employees.  The total number of cars purchased or leased by Home Abstract during the relevant time period was 6-8.[89]

59.     In early 2012, Home Abstract "paid off" the cars and then "gave" them to the family members and employees when it closed its doors in May 2012.[90]

60.     Home Abstract also provided "anyone with a car" with a Chevron credit card for gas, including Gina who had been retired since 2009 and Jacob who had not worked at Home Abstract since 2008.  The gas charges often exceeded $1,500 per month.[91]

61.     Home Abstract paid for the repairs on these cars.[92]

62.     Home Abstract also paid for cell phones.[93]

---

[86] Bangle Depo. 36:21-22.

[87] Maughan Depo. 28:11-16; 31:25-32:2.

[88] Bangle Depo. 12:14-24.

[89] Maughan Depo. 28-11-18.

[90] Maughan Depo. 28-11-18; 29:9-30:10.

[91] Bangle Depo. 123:15-20; Maughan Depo. 31:22-32:2.

[92] Bangle Depo. 131:19:22.

63.     And, despite the fact that Home Abstract was operating at a significant loss each month, it continued to pay "commissions" to Maughan and Bangle on real estate closings even if they were not acting as the escrow officer on the transaction.[94] During that time, Bangle was not working as an escrow officer and did not receive commissions.[95]

64.     In the span of two weeks in November 2011, Bangle transferred over $10,000 from the Operating Account to Maughan.  Bangle claims that she never asked Maughan any questions about the transfers other than how to code them in QuickBooks.[96]

65.     During this period of time, Maughan was just taking money out of the Operating Account "as I needed it."  And Bangle was the one who transferred this money to Maughan or issued the checks to him.[97]

66.     Maughan, with Bangle's assistance, was also purchasing Iraqi dinar as an "investment" using funds which had been transferred from the Trust Account to the Operating Account.  Specifically, on September 6, 2011, Bangle used funds from the Operating Account for a cashier's check in the amount of $2,160 to purchase Iraqi dinar from Sterling Currency Group.  On November 21, 2011, Bangle used funds from the Operating Account for a cashier's check in the amount of $3,600 to purchase Iraqi dinar from Sterling Currency Group.[98] Bangle did not know that Maughan was investing in Iraqi dinar.[99]

---

[93] Bangle Depo. 126:17-25.

[94] Maughan Depo. 200:13-201:15.

[95] Bangle Aff. ¶¶ 4, 24; Bangle Depo. 114:21-24; 10:13-15.

[96] Bangle Depo. 153:9-12.

[97] Maughan Depo. 206:19-207:5.

[98] Maughan Depo. 204:9-19.

[99] Bangle Aff. ¶ 32.

67. On October 6, 2011, Maughan and his brother were involved in a real estate transaction being closed by Bonneville Superior Title. To fund the transaction, Maughan initiated a wire transfer from Home Abstract's Recording Account to Bonneville Superior Title in the amount of $70,374.43.[100]

68. The Recording Account was a small account with average daily balances of less than $5,000. Consequently, if the wire transfer was processed, it would overdraw the Recording Account by approximately $68,000.[101]

69. When Travis Jensen, KeyBank Small Business Relationship Manager, contacted Maughan about the overdraft, Maughan told him that other checks would be coming in the next two or three days that would cover the overdraft. Maughan did not mention the source of the checks.[102]

70. Although Jensen had not seen transactions of that size - $68,000 – moving through the Recording Account before, Jensen and his supervisor authorized the approximately $68,000 overdraft to the Recording Account because of Maughan's "trusted position" with Home Abstract and that he was "well known in the Weber County area" and "seemed a man of good nature."[103]

---

[100] Maughan Depo. 74:4-15; Deposition of Travis Jensen ("Jensen Depo.") at 70:20-24. [Docket No. 39-3]

[101] Jensen Depo. 40:19-22.

[102] Jensen Depo. 40:13-15; 71:4-24.

[103] Jensen Depo. 41:12-16; 75:2-13.

71.     Maughan did not deposit the promised checks into the Recording Account. After a week or so, KeyBank became "extremely concerned" and asked Maughan whether it could offset the overdraft with funds in the Trust Account.[104]

72.     Maughan and KeyBank discussed the fact that the funds in the Trust Account were escrow funds that belonged to third parties, not Home Abstract. Nevertheless, KeyBank insisted and Maughan eventually agreed that KeyBank could debit approximately $66,000 from the Trust Account to cover the overdraft in the Recording Account.[105]

73.     On October 20, 2011, KeyBank debited $65,723.46 from the Trust Account to cover the overdraft in the Recording Account. This actual funds used were the Proceeds from the Weber School District transaction.[106]

74.     Home Abstract acted as the escrow agent for a real estate transaction – the sale of an old school building – between Weber School District and Huntsville City, which closed on October 11, 2011.[107]

75.     Weber School District was supposed to receive cash proceeds in the amount of $306,923.00 ("Proceeds"). Although Maughan claims a check was issued to Weber School District in the amount of $306,923, Maughan admits the check was never delivered to Weber School District.[108]

---

[104] Jensen Depo. 81:17-22; 88:13-89:4.

[105] Jensen Depo. 91:7-16; 92:16-95:19; 97:20-100:19; Maughan Depo. 72:20-24; 73:16-21.

[106] Exhibit 7 to Old Republic's Motion. [Docket No. 41-2].

[107] Maughan Depo. 83:8-12.

[108] Maughan Depo. 83:8-84:89:4; 97:8-98:99:20; Exhibit 4 to Old Republic's Motion. [Docket No. 39-4].

76.     Instead, Defendants wrongfully diverted the Proceeds to the Operating Account. Specifically, Maughan told Bangle to transfer the remaining Proceeds from the Trust Account to the Operating Account because "we needed to get that money out of the – out of that account."[109]

77.     During the November 2011 to March 2012 time period, whenever Bangle would tell Maughan that she needed "so much money" to pay bills, Maughan would tell her to "write a check from the escrow account [Trust Account] to the operating account."  Sometimes Bangle would wire transfer the funds.[110]

78.     As Maughan testified, Bangle was in charge of the Operating Account and "she knew there wasn't money in the operating account."[111] Bangle was frequently worried about having funds for payroll or bills, and even discussed this concern with her father that the business couldn't survive.  However, Maughan told her that "everyone was depending on him" and that he wasn't going to be "kicking everybody to the curb."[112]

79.     Maughan further testified that at least $50,000 of the Proceeds was directly paid to him.[113]

80.     In early 2012, Weber School District discovered that it had not received the Proceeds from the transaction with Huntsville.  Weber School District repeatedly made demand upon Home Abstract for the Proceeds.

81.     When Home Abstract failed to tender the Proceeds, Weber School District made demand upon Old Republic on or about May 7, 2012.  Consequently, Old Republic tendered

---

[109] Maughan Depo.  88:25-89:92:1; 104:15-23.

[110] *Id.*

[111] Maughan Depo.  92:18-23.

[112] Bangle Aff. ¶¶ 13-14; Bangle Depo. 79:16-80:23.

[113] Maughan Depo.  94:17-19.

payment to Weber School District. Old Republic has demanded that Defendants reimburse it for the amount of the Proceeds but they have refused.

82. Maughan testified that he "gave the monies [the remaining Proceeds] to [Bangle] to make bills and payroll."[114]

83. Maughan pled guilty to second degree felony theft in connection with his embezzlement of the Proceeds.[115]

84. He was also charged with theft related to the embezzlement from the Martinez Trust Account.[116]

85. From November 2011 through March 2012, over $300,000 of the Proceeds was transferred from the Trust Account to the Operating Account.[117]

86. Although it came from the Trust Account, Bangle claims that she thought it was a "loan" from the Family Partnership and did not ask Maughan any further questions about the transfers except how to code them in QuickBooks.[118]

87. At the time of the embezzlements from the Martinez Trust Account and the Trust Account, Maughan and Bangle were the only officers and directors working at Home Abstract.[119]

88. In November 1989, Old Republic's predecessor and Home Abstract entered into an Agreement for Appointment of Policy Issuing Agent ("Agency Agreement").[120]

---

[114] Maughan Depo. 15:12-14; 16:4-6.

[115] Maughan Depo. 57:4-14.

[116] Maughan Depo. 61:13-18.

[117] Maughan Depo. 62:17-22.

[118] Bangle Depo. 144:4-147:18; 153:9-12.

[119] Maughan Depo. 165:10-17.

89.     Pursuant to Section VII of the Agency Agreement, Home Abstract is liable for any loss caused by its "defalcation, fraud or dishonesty on the part of Agent [Home Abstract] or any of its officers, directors, employees or partners."[121]

90.     Section VII also provides that Home Abstract is liable for any loss caused by the "escrow or other business of agent."[122]

91.     Section VII further provides that if Old Republic "incurs expenses or pays a claim of loss for which Agent [Home Abstract] is responsible, Agent agrees to reimburse Insurer for such amounts upon demand."[123]

92.     Section XI of the Agency Agreement specifically states that the "relationship created by this agreement does not extend to any escrow, closing or settlement business (hereinafter referred to as 'escrow business') conducted by Agent [Home Abstract] . . . or to any other activity of Agent that does not involve Insurer's assumption of liability for the condition of title."[124]

93.     Section XI also requires Home Abstract "to maintain adequate records, as may be required by Insurer, as to any escrow and closing funds being handled by Agent in transactions in which Insurer's title insurance forms are issued, and to keep all such funds properly segregated in a trust or escrow account in a federally insured institution."[125]

---

[120] Maughan Depo. 121:1-122:19; Exhibit 12 to Old Republic's Motion. [Docket No. 41-7].

[121] Exhibit 12 to Old Republic's Motion. [Docket No. 41-7].

[122] *Id.*

[123] *Id.*

[124] *Id.*

[125] *Id.*

94.     Section XI further provides that in the event Old Republic "makes a payment of a claim arising out of the conduct of an Agent's escrow business . . . either as a result of entry of a judgment against Insurer or as a result of compromise and settlement, Agent shall promptly reimburse Insurer for the full amount of Insurer's expenditures, including attorney fees and costs of litigation or settlement negotiations."[126]

95.     Section XII states that a "material breach" of the Agency Agreement includes "a shortage in Agent's accounts of funds entrusted to Agent by Insurer or others."[127]

96.     Bangle was not employed by Home Abstract at the time the Agency Agreement was signed in 1989, nor was she an officer of Home Abstract at this that time. Thus, she has no knowledge regarding the Agency Agreement or any of the provisions of the Agreement.[128]

97.     In his deposition, Maughan admitted that Home Abstract breached the Agency Agreement and that Old Republic's loss resulted from his defalcation, dishonesty, and fraud.[129]

98.     Maughan further admitted that Old Republic's loss resulted from Home Abstract's escrow business and that Home Abstract did not keep the Proceeds in a properly segregated escrow account as required by the Agency Agreement.[130]

99.     Maughan further admitted that Defendants have not reimbursed Old Republic for its loss even though Old Republic has made a demand for payment.[131]

---

[126] *Id.*

[127] *Id.*

[128] Bangle Aff. ¶¶ 3-7.

[129] Maughan Depo. 124:3-9.

[130] Maughan Depo. 125:6-126:9.

[131] Maughan Depo. 127:3-20; 158:13:22.

100.    Maughan admitted that as a result of Defendants' breaches of the Agency Agreement, Old Republic has suffered damages of at least $306,923.[132]

101.    Maughan admitted that Defendants had fiduciary duties to Old Republic[133] regarding his own actions as President of Home Abstract.[134]

102.    As the years passed, Bangle's uncles retired and she was asked to take over paying the bills and making sure taxes were paid. Bangle stopped performing escrow functions in 2009, and switched to processing payroll, accounts receivable and accounts payable.[135] Bangle remained a licensed escrow officer and a signatory on the Trust Account until Home Abstract closed its doors in May 2012. Further, it is undisputed that Bangle wrote checks and initiated wire transfers from the Trust Account to the Operating Account after 2009, including the approximately $300,000 she transferred in October and November 2011.[136]

103.    At some point during her work at the company, Bangle became an officer of Home Abstract. Specifically, she was listed as secretary of the corporation. However, she was not privy to the details or inner workings of the corporation. That was all handled by her father, Russell Maughan, and his brothers.[137] Maughan testified that Home Abstract "would have meetings with Gina [his wife] and Brandy [Bangle] as the corporate officers . . . at least once a

---

[132] Maughan Depo. 128:15-20.

[133] Maughan Depo. 130:3-5.

[134] Maughan Depo. 124:3-130:5; Bangle Aff. ¶¶ 6-8.

[135] Bangle Aff. ¶ 4.

[136] Exhibit C to Old Republic's Reply Memorandum.[ Docket No. 48-3].

[137] Bangle Aff. ¶ 6.

month."[138] In addition, Bangle was responsible for filing Home Abstract's annual reports with the State of Utah.[139]

104.    Bangle did not make any financial decisions on behalf of Home Abstract, either by herself or in consultation with her father or uncles.  She was a signatory on the Operating Account, but only wrote checks, signed checks and transferred money when she was directed to do so by her father.[140]  Bangle made the "financial" decision to transfer over $300,000 from the Trust Account to the Operating Accounting, knowing that those funds belonged to a third party, not Home Abstract, and knowing that funds in the Trust Account could not be transferred to the Operating Account for any reason.[141] Bangle made the "financial" decision to use those funds to pay Home Abstract's alleged "operating" expenses and the personal obligations of Maughan. Bangle also made the "financial" decision to continue to pay for cars and gas and other non-essential expenses even though Home Abstract was operating a loss every month.[142]

105.    At the direction of her father, Bangle maintained the Operating Account.[143] Bangle was a signatory on the Trust Account and that she personally transferred over $300,000 from the Trust Account to the Operating Account in October and November 2011, which directly resulted in Old Republic's loss.[144]

---

[138] Maughan Depo. 141:13-19.

[139] Bangle Depo. 37:14:16.

[140] Bangle Aff. ¶ 7.

[141] Exhibit C to Old Republic's Reply Memorandum. [Docket No. 48-3].

[142] Maughan Depo. 21:7-22:7; 62:17-22; 88:25-94:19; 104:15-23; 110:2-7.

[143] Bangle Aff. ¶ 8.

[144] Exhibit C to Old Republic's Reply Memorandum. [Docket No. 48-3].

106.     In fact, Maughan always reviewed the checks that Bangle wrote out, before she sent them to the various vendors.  She always had to obtain his approval for all of the company's expenses.[145] When asked whether Home Abstract had any mechanisms to control what checks were being issued and who was issuing them, Bangle testified that there were no "check points" and that she "issued most of the checks." She also testified that Maughan "liked to personally sign all the payroll checks when he was available" but his availability "became less and less over the years [because] he did some traveling in the [2008-2012] time period."[146] It was not until Bangle was questioned about specific checks she issued to herself that she claimed Maughan reviewed all of them. Further, many of the alleged "reimbursement" checks were issued on the same day that she signed payroll checks. Indeed, in 2011, Maughan did not sign one payroll check. He only signed three checks from the Operating Account in 2011:  two checks to the Utah State Tax Commission (February and April 2011) and a check to the Department of Workforce Services (April 2011). All other checks were signed by Bangle, including all payroll checks.[147] Maughan would have been unavailable to review the reimbursement checks.[148]

107.     There were always discrepancies when Bangle would reconcile the Operating Account at the end of the month, some of which were large.  When she asked Maughan about these large missing amounts of money, he would tell Bangle that the money went to another entity as a loan.  She was also told that Home Abstract was receiving loans from the Maughan

---

[145] Bangle Aff. ¶ 9.

[146] Bangle Depo. 32:12-16.

[147] Bangle Depo. 31:22-32:16.

[148] Exhibit E to Old Republic's Reply Memorandum. [Docket No. 48-5].

Family.[149] Bangle did not attempt to verify Maughan's statements. Nor did she have any personal knowledge as to whether the loans actually existed. Bangle has never seen any documentation of the loans and she was told they existed by Frank and Richard "at one point," presumably prior to 2008.[150] Payments to Maughan (or on behalf of Maughan) were never credited to a specific "loan" in Quick Books.[151] Maughan testified that the notes reflecting the alleged loans were kept in files at his house where his wife (Bangle's mother) still lives. Neither Maughan nor Bangle, however, has produced the notes or any other documentation of the alleged loans despite Old Republic's request for them.[152]

108.    In approximately 2009, business started slowing down and Home Abstract closed the Layton location at some time after 2009.  After that, during approximately the last year that Home Abstract was open, the monthly overdrafts in the Operating Account started.[153]

109.    During that same time frame, Bangle became increasingly worried about the company and spoke with Maughan on different occasions about her concerns.  Bangle told Maughan that Home Abstract had too much overhead and not enough income, and that the company should think about reducing things like staff cars or employees.  Maughan always responded that business would pick up in a month or two.[154]

110.    Bangle was also a signatory on the Trust Account.[155]

---

[149] Bangle Aff. ¶ 11.

[150] Bangle Depo. 41:8-3.

[151] Maughan Depo. 52:6-12.

[152] Maughan Depo. 81:11-18; 161:24-163:25.

[153] Bangle Aff, ¶ 12.

[154] Bangle Aff. ¶ 13.

[155] Bangle Aff. ¶ 15.

111.     Since she was a signatory on the Trust Account, if no other signatory was present at the office, the escrow officers would bring Bangle checks to sign for closings.  Bangle never questioned these checks because she had no involvement in the closings after 2009 when she ceased acting as an escrow officer.[156]  In addition to checks she may have signed at the request of an escrow officer, Bangle issued checks from the Trust Account to the Operating Account unrelated to a closing. In October and November 2011, for example, Bangle transferred over $300,000 from the Trust Account to the Operating Account unrelated to any closing.

112.     Home Abstract was also in charge of another trust account, the Martinez Trust Account.  This was for one of its clients, and was set up so that Home Abstract made a monthly payment to the client's ex-wife.  Maughan would direct Bangle to transfer funds into the Martinez Trust Account, and then to cut a check to the ex-wife.  Other than that, Bangle did not have any dealings with the Martinez Trust Account, she was not in charge of it and did not know anything further about it.[157]

113.     One of Bangle's duties at Home Abstract was to reconcile the Operating Account. In performing this function, if she came across a transaction that wasn't clear what it was for, or if funds were missing she always asked Maughan about it.[158]

114.     It has always been Bangle's understanding that the Maughan Family (her father and her uncles) were financing the day to day operations of Home Abstract.[159]

---

[156] Bangle Aff. ¶ 16.

[157] Bangle Aff. ¶ 17.

[158] Bangle Aff. ¶ 18.

[159] Bangle Aff. ¶ 19.

115.     Bangle trusted her father, and because Maughan and her uncles had told her of the regular loans from the Maughan Family, it made sense to Bangle that money would be going to pay back these loans.[160]

116.     Maughan also told Bangle that he had various investments and notes from which he would be receiving money, and that he would "cover" the funds transfers with money from the investments and notes.[161]

117.     Another one of Bangle's duties at Home Abstract was purchasing office supplies. After 2009 and as we continually slowed down more and more, she was asked to hold her personal paycheck several times until Maughan could find enough money to cover payroll. Bangle was also asked to put more and more company expenses on her personal cards or to personally make payments for Maughan's bills (house payments, American Express payments, etc).[162] Other than her testimony, Bangle has offered no evidence of these alleged expenses. She has not produced a single credit card statement.[163]

118.     Then as the company received income, Bangle was allowed to reimburse herself from the company.  Regarding payment of his personal bills, Maughan always told Bangle that he would account for the reimbursements through his personal loans with the company.[164]

119.     When Bangle did make company purchases with my personal funds, she would submit receipts to Maughan for these purchases, and aside from these approved reimbursements, she never used company funds to pay any off any debts in her own name.  Especially in the last

---

[160] Bangle Aff. ¶ 20.

[161] Bangle Aff. ¶ 21.

[162] Bangle Aff. ¶ 22.

[163] Exhibit D to Old Republic's Reply Memorandum. [Docket No. 48-4].

[164] Bangle Aff. ¶ 23.

year that Home Abstract was open, Bangle was making a lot of company purchases with her own funds. These purchases got to be so numerous that she could not remember each individual transaction.[165] When asked whether Home Abstract had any mechanisms to control what checks were being issued and who was issuing them, Bangle testified that there were no "check points" and that she "issued most of the checks."[166]

120. Bangle also found out afterwards that Maughan had purchased Iraqi dinar as an investment. She had no idea that Maughan had made these purchases.[167] According to Bangle's affidavit, her father "had mentioned the idea of investing in [Iraqi] denir . . . and I told him that I thought it was a scam and he shouldn't do it."[168] Bangle used trust funds which she had transferred to the Operating Account to purchase two large cashier's checks for "Sterling Currency Group." Bangle has offered no explanation as to why Home Abstract would be purchasing "currency."

121. During her time at Home Abstract, Bangle received a salary of $35,000 per year, which was paid through a payroll company. She also received $600 per month as reimbursement for business expenses that she had paid with my personal funds, such as health insurance, office supplies and her cell phone bill.[169]

---

[165] Bangle Aff. ¶ 25.

[166] Bangle Depo. 32:12-16.

[167] Bangle Aff. ¶ 32.

[168] Bangle Aff. ¶ 32.

[169] Bangle Aff. ¶ 33.

122.     When Bangle was working as an escrow officer, she was also paid commissions based on the closings that she performed.  However, after 2009 when she stopped performing escrow functions, she stopped receiving commissions as well.[170]

123.     Bangle also received compensation in the form of a company car and fuel for the car, as the other employees did.  In fact, Home Abstract had several loans for vehicles.  The employees would use the cars to go to and from work, run to purchase office supplies or deliver documents for the company.  Bangle did use my company car for business purposes but she never used my car or fuel card for personal business.[171] Besides herself and her father, several of Bangle's family members have been involved with Home Abstract, such as her mother Gina, her brother Jacob and her husband John Bangle.  Gina had retired several years before the company closed in May 2012 and Jacob only worked as a delivery driver for a few months.[172]

124.     Bangle believes that Gina and Jacob received some of the same reimbursements that other employees did, such as Gina's car being paid by the company and Jacob being on the company cell phone contract.  Bangle also knows that Jacob and his daughter were living with her parents for awhile.[173] Bangle's husband occasionally performed "handyman" type services for the company, such as repairing broken lights, buying parts for the company cars, putting together cubicles, just generally any repair work that Maughan asked him to do.[174]

---

[170] Bangle Aff. ¶ 34.

[171] Bangle Aff. ¶ 35.

[172] Bangle Aff. ¶ 37.

[173] Bangle Aff. ¶ 38.

[174] Bangle Aff. ¶ 39.

125.     Bangle was aware of the Weber School District transaction but was not aware of the details of the closing or disbursements.[175] Bangle remained a licensed escrow officer until Home Abstract closed its doors in May 2012.

126.     Because her father was president of Home Abstract, and her employer, when he gave Bangle tasks to do, she completed them as instructed.  She did not feel that it was her place to question the president of the company as to how he was running his business affairs.[176]

---

[175] Bangle Aff. ¶ 41.

[176] Bangle Aff. ¶ 46.

**I.      Breach of the Agency Agreement (First Cause of Action)**

The elements of a breach of contract claim are (1) a contract; (2) performance by the party seeking recovery; (3) breach of contract by the other party; and (4) damages.[177] It is undisputed that the Agency Agreement was an enforceable contract between Home Abstract and Old Republic; that the Agency Agreement was signed by Maughan as President, and that Old Republic performed its obligations under the Agency Agreement.  The undisputed material facts establish that the Agency Agreement was breached as a result of Maughan's embezzlement of the Proceeds. Specifically, Section VII of the Agency Agreement was breached when Old Republic suffered a loss caused by "defalcation, fraud or dishonesty on the part of Agent [Home Abstract] or any of its officers, directors, employees or partners." Section VII of the Agency Agreement was also breached when Old Republic suffered a loss caused by the "escrow or other business of agent." Section VII provided that if Old Republic "incurs expenses or pays a claim of loss for which Agent [Home Abstract] is responsible, Agent agrees to reimburse Insurer for such amounts upon demand." Section XI further provided in the event Old Republic "makes a payment of a claim arising out of the conduct of an Agent's escrow business . . . either as a result of entry of a judgment against Insurer or as a result of compromise and settlement, Agent shall promptly reimburse Insurer for the full amount of Insurer's expenditures, including attorney fees and costs of litigation or settlement negotiations." Finally, Section XII stated that a "material breach" of the Agency Agreement included "a shortage in Agent's accounts of funds entrusted to Agent by Insurer or others."

---

[177] *Mahmood v. Ross*, 1999 UT 104, ¶ 9.

The undisputed material facts also demonstrate that as a direct result of Maughan's embezzlement of over $300,000 from the Trust Account, Old Republic was forced to pay $306,923 to Weber School District. Home Abstract has failed to reimburse Old Republic for this payment as required by the Agency Agreement. Consequently, Home Abstract breached the Agency Agreement and is liable to Old Republic for all damages resulting from the breach, including $306,923 and Old Republic's attorney fees and costs. In addition and discussed further in Section IV below, Old Republic is entitled to pierce the corporate veil as to Maughan and hold Maughan personally liable for Home Abstract's breach of the Agency Agreement. Accordingly, Old Republic is entitled to summary judgment on its First Cause of Action (Breach of Contract) as against Home Abstract and Maughan.

Bangle, however, did not sign the Agency Agreement and cannot be said to be personally liable for Home Abstract's breach of the Agency Agreement without piercing the corporate veil as to Bangle, a claim that must go to trial for the reasons set forth in Section IV below. Accordingly, Old Republic is not entitled to summary judgment on its First Cause of Action as against Bangle.

## II.      Breach of Fiduciary Duty (Second Cause of Action)

A claim for breach of fiduciary duty requires proof of four elements:  (1) a fiduciary relationship; (2) breach of the fiduciary's duty; (3) causation, both actual and proximate; and (4) damages.[178] Maughan and Bangle concede that as licensed escrow officers and as officers and directors of Home Abstract they had a fiduciary relationship with Old Republic. By transferring escrow funds from the Trust Account to the Operating Account, which funds were then used to

---

[178] *See Shaw Resources v. Pruitt, Gushee & Bachtell*, 2006 UT App 313, ¶ 22, 142 P.3d 560.

pay the personal expenses of Maughan, Maughan and Bangle breached these fiduciary duties. As a direct result of their breaches, Old Republic has incurred damages in the amount of $306,923, which is the amount Old Republic was forced to pay Weber School District.

Bangle, however, argues that she is not personally liable to Old Republic because she was simply following Maughan's directions. But Bangle was obligated to exercise her independent duties of loyalty, good faith, fair dealing, skill, competence, and reasonable care regardless of the reasons Maughan gave her for the improper transfers or his promise to "cover" the funds transferred or her trust in him. Bangle admits that she knew that money was frequently missing from the Operating Account and that Maughan had taken the money, that funds in the Trust Account belonged to third parties, not Home Abstract, and that funds could not be transferred from the Trust Account to the Operating Account for any reason. Despite her knowledge and independent duties, Bangle personally transferred over $300,000 from the Trust Account to the Operating Account and then used these funds to pay the operating expenses of Home Abstract and the personal expenses of Maughan. Accordingly, Old Republic is entitled to summary judgment on its Second Cause of Action against Home Abstract, Maughan and Bangle.

### III.    Negligence (Fifth Cause of Action)

The elements of a negligence claim are: (1) Defendants owed Old Republic a duty; (2) Defendants breached that duty; (3) the breach of duty was the proximate cause of Old Republic's

injury, and (4) Old Republic in fact suffered damages.[179] The issue of whether a duty exists is entirely a question of law to be determined by the court.[180]

As set forth in Section II above, Defendants owed fiduciary duties to Old Republic and breached their duties by wrongfully diverting over $300,000 of the Proceeds from the Trust Account to the Operating Account and then using those funds to pay the operating expenses of Home Abstract and the personal expenses of Maughan. Defendants do not dispute – nor could they – that as a direct result of their actions, Old Republic was injured and suffered damages in the amount of $306,923, the amount that Old Republic was forced to pay Weber School District. Accordingly, Old Republic is entitled to summary judgment on its Fifth Cause of Action against Home Abstract, Maughan, and Bangle.

### IV.    Piercing the Corporate Veil (Tenth Cause of Action)

The corporate veil may be pierced when (1) there is such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist, *viz.*, the corporation is, in fact, the alter ego of one or a few individuals; and (2) the observance of the corporate form would sanction a fraud, promote injustice, or an inequitable result would follow.[181] The two part test separates the court's inquiry into two prongs: the "formalities requirement" (referring to the corporate formalities required by statute) and the "fairness

---

[179] *See Webb v. University of Utah*, 2005 UT 80, ¶ 9, 125 P.3d 906 (internal quotation marks omitted).

[180] *Lopez v. United Auto. Ins. Co.*, 2009 UT App 389, ¶ 8, 222 P.3d 1192 (quoting *Ferree v. State,* 784 P.2d 149, 151 (Utah 1989)).

[181] *Jones & Trevor Mktg., Inc. v. Lowry*, 2012 UT 39, ¶ 14, 284 P.3d 630 (citing *Norman v. Murray First Thrift & Loan Co.*, 596 P.2d 1028, 1030 (Utah 1979)).

requirement" (which speaks to the conscience of the court).[182] Factors generally considered include: (1) undercapitalization of a one-man corporation; (2) failure to observe corporate formalities; (3) nonpayment of dividends; (4) siphoning of corporate funds by the dominant stockholder; (5) nonfunctioning of other officers or directors; (6) absence of corporate records; (7) the use of the corporation as a facade for operations of the dominant stockholder or stockholders; and (8) the use of the corporate entity in promoting injustice or fraud.[183] Further, to be recognized as an entity separate from its shareholders, a corporation must be operated as a distinct and separate entity, with its own books, records, and bank accounts.[184] Courts allow the corporate veil to be pierced when there is compelling evidence that shareholders used corporate funds for personal use, mixed corporate and personal accounts, or commingled corporate and personal assets in a way that ownership interests were indistinguishable.[185]

The undisputed facts demonstrate Maughan used Home Abstract's funds, including escrow funds belonging to third parties, for his personal obligations and that he regularly commingled corporate and personal assets. In addition, Home Abstract did not hold any meetings, maintain corporate books and records, or otherwise observe corporate formalities. Further, the recognition of the corporate form as to Maughan would promote injustice. Maughan embezzled funds from the Trust Account so he could continue to pay his personal obligations, speculate in foreign currency, and participate in other risky investments. Given his defalcation

---

[182] *Salt Lake City Corp. v. James Constructors, Inc.*, 761 P.2d 42, 47 (Utah Ct. App. 1988) (citing *Messick v. PHD Trucking Serv., Inc.*, 678 P.2d 791, 794 (Utah 1984)).

[183] *Lowry* at ¶ 16.

[184] 1 Fletcher Cyc. Corp. § 41.50 at 210 (Rev. Vol. 2006) (citing *Hystro Products, Inc. v. MNP Corp.*, 18 F.3d 1384 (7th Cir. 1994); *United States v. Walton*, 909 F.2d 915 (6th Cir. 1990)).

[185] *Id.*

and the fact that his repeated disregard of the corporate entity caused the injury to Old Republic, Maughan cannot hide behind the corporate form and Old Republic is entitled to summary judgment on its Tenth Cause of Action as against Maughan only.

With respect to Bangle, there are disputed issues of fact as to whether she used Home Abstract's funds, including escrow funds belonging to third parties, for her personal obligations. These disputed issues of fact must be resolved at trial. Consequently, Old Republic is not entitled to summary judgment against Bangle on its Tenth Cause of Action.

## V. Indemnification (Ninth Cause of Action)

There are three elements of equitable indemnification: (1) the prospective indemnity (Old Republic) must discharge a legal obligation owed to a third party (Weber School District); (2) the prospective indemnitors (Defendants) must also be liable to the third party (Weber School District); and (3) as between the prospective indemnitors (Defendants) and the prospective indemnitee (Old Republic), the obligation should be paid by the indemnitors (Defendants).[186] The undisputed facts demonstrate that Home Abstract and Maughan are obligated to indemnify Old Republic for the amount it was required to pay to Weber School District as a result of the embezzlement. Specifically, it is undisputed that Home Abstract was liable to Weber School District for the Proceeds that were embezzled by Maughan. There is also no question that Maughan, as the escrow officer who embezzled the Proceeds, is also personally liable to Weber School District for the Proceeds. Pursuant to Utah's title agent defalcation statute, Old Republic was required to discharge Home Abstract's and Maughan's obligation to Weber School

---

[186] *See Salt Lake City School Dist. v. Galbraith & Green*, 740 P.2d 284, 287 (Utah Ct. App. 1987).

District.[187] Accordingly, Home Abstract and Maughan, jointly and severally, are obligated to indemnify Old Republic for its loss pursuant to the doctrine of equitable indemnification and Old Republic is entitled to summary judgment on its Ninth Cause of Action as against Home Abstract and Maughan only.

## ORDER

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that Old Republic's Motion for Summary Judgment is GRANTED IN PART AND DENIED IN PART.

IT IS FURTHER ORDERED that Old Republic is granted judgment against Home Abstract on its First Cause of Action (Breach of Contract), Second Cause of Action (Breach of Fiduciary Duty); Fifth Cause of Action (Negligence); and Ninth Cause of Action (Indemnification);

IT IS FURTHER ORDERED that Old Republic is granted judgment against Maughan on its First Cause of Action (Breach of Contract), Second Cause of Action (Breach of Fiduciary Duty); Fifth Cause of Action (Negligence); Ninth Cause of Action (Indemnification); and Tenth Cause of Action (Piercing the Corporate Veil).

IT IS FURTHER ORDERED that Old Republic is granted judgment against Bangle on its Second Cause of Action (Breach of Fiduciary Duty) and Fifth Cause of Action (Negligence);

IT IS FURTHER ORDERED that Old Republic is granted judgment against Home Abstract in the amount of $306,923, together with pre-judgment and post-judgment interest and attorney fees and costs;

---

[187] *See* Utah Code Ann. §31A-23a-407.

IT IS FURTHER ORDERED that Old Republic is granted judgment against Maughan in the amount of $306,923, together with pre-judgment and post-judgment interest and attorney fees and costs; and

IT IS FURTHER ORDERED that Old Republic is granted judgment against Bangle in the amount of $306,923, together with pre-judgment and post-judgment interest. Any award of attorney fees and costs shall be determined by a separate motion.

Judgment shall be entered when the remaining claims in this case are resolved. Judgment for $306,923 together with pre-judgment and post-judgment interest shall be entered jointly and severally against all Defendants.

Signed June 27, 2014.

BY THE COURT

_____
District Judge David Nuffer